We have four arguments this morning, beginning with case number 23-1882, Global Tubing against Tenaris Coiled Tubes. Thank you, Judge Toronto, and may it please the Court, John O'Quinn on behalf of Tenaris. The District Court granted summary judgment of inequitable conduct against Tenaris by resolving disputed fact issues on each of specific intent, platform materiality, and cumulativeness, for each of which Global has the burden of proof. In so doing, the District Court applied the wrong legal standards while fundamentally misreading the two key documents on which it relied. At the same time, it failed to acknowledge other evidence on materiality and cumulativeness, like the grandchildren patent applications and the expert analysis of former Commissioner Robert Stoll. For its part, Global Tubing doesn't really even attempt to defend... Can I just ask you, so on inequitable conduct, all the focus is on Mr. Valdez, right? That's correct. And is that because, is there precedent saying that for inequitable conduct, the challenger has to specify which human beings committed it, and Mr. Valdez is the only human being that is pled as the inequitable actor? So, Judge Toronto, you're right. Inequitable conduct has to be by an individual. What case is it? Exergen. Exergen. There's a footnote in Exergen. It refers specifically to the PTO rule on which this doctrine relies. And so it's well established that it has to be by an individual. In fairness to Global, Dr. Valdez is not the only individual that they identified, but that is the only individual that the District Court identified. So if the case were to go back, is it at least a potential question whether other people like some of the lawyers involved might have made inequitable judgments, to use an improper term? I think that's a fair assessment, Judge Toronto. As the case comes to you, the District Court seems to have identified Dr. Valdez as the person who committed inequitable conduct, and then for purposes of the 07, and that's with respect to the 256 patent, and then for purposes of the 074 and the 075 patents, the District Court relied on the concept of infectious unenforceability, then going back to the purported inequitable conduct by Dr. Valdez. I have another question to divert you from what you want to talk about. That's quite all right. I'm here to answer your questions. The premise of this question is that both inequitable conduct and Section 2 go back. Yes. What will be the procedure? Has that been settled? Is it determined? How is it affected by, you know, the beacon feeders, Dairy Queen rules, and all of that? So a couple of points. I think both issues, if they were to go back, both issues, and certainly the issue of Section 2 attempted monopolization would be subject to further summary judgment motion, or further consideration for summary judgment. For example, the District Court didn't reach the issue of actually defining the market. The District Court, I think, assumed, as we did for purposes of argument, assumed their market. So there are a number of issues that I think the District Court would have before it. But getting where you're going with your question, if there was ultimately to be a trial, then the issues that underlie inequitable conduct would be, I think, tried to a jury because of beacon feeders and the Seventh Amendment issue. Because the inequitable conduct issue overlaps so extensively with the, let's call it the Walker process bad conduct. It is the basis for the first element of a Walker process claim. I don't remember that either side here or our case law says they're identical, but they're. . . In a post-Theresense world, there's a lot of. . . Pre-Theresense, I think there were some significant differences. I think there are some differences, and so there may be some daylight between the two. Obviously, for Walker process, in addition to proving the anti-competitive conduct that is the predicate for it, you then have to prove all of the other factors. In your view, if Section 2 got to trial, there would be a trial, two adjudicators, one presentation of evidence with the jury having to adjudicate the. . . The common issues. The common issues, and then the judge would be bound by those. That's right. At least, let me put it this way, Judge Stronto. I think that was the party's understanding of the case. Circumstances may have changed. It is possible that circumstances would change for one reason or another, so I don't want to say that that is definitively what would happen, but it is certainly within the realm of distinct possibility on remand.  If we vacate summary judgment of inactual conduct and send it back, I take it you would agree that because the district court did not reach the affirmative egregious misconduct allegations that you would still potentially have to confront those on summary judgment on remand. I think that's right, Judge Stark. Obviously, this court could, as a theoretical matter, decide . . . This is if we vacate and remand. Right. You did move for summary judgment. We did. No inequitable conduct. Is that before us as well? It is, but it isn't complete. What I mean by that is we moved for summary judgment of no inequitable conduct on two grounds. One had to deal with an issue related to inventorship. That issue, the district court did not decide and decided to present a disputed issue as a fact, so at a minimum that would remain. The issues of intent and materiality and no affirmative egregious misconduct are things that we did move for summary judgment for, and so you could, as a theory . . . How about materiality? You think at minimum there's a genuine disputed material fact about materiality. Is that right? Yes, that's right. How can that be? It seemed like the SIMEX brochure and your patent, the 256 patent at least, that the ranges overlap. How could we say that there's even a fact dispute on whether it's but-for material? Yes, so Judge Stark, a couple of points. First of all, with respect to . . . Let me start on the concept of accumulativeness, and then I'll move into but-for materiality specifically because they are interrelated. This court's decision in Larson is very clear that on the question of but-for materiality and whether or not a prior art reference is cumulative, the question is . . . A question is, is it less relevant? Is it less relevant than information that's already been considered by the examiner? If there is disclosed prior art that, quote, than the omitted ones, end quote, then that makes . . . which makes the disclosed prior art more material than it would be cumulative or not but-for material. That is the undisclosed art. And that's exactly what you have here with the Chitwood reference and the 4100 series, and for that matter as well, the Valdez 2010 or Valdez 363 reference. The Chitwood reference and the 4100 series that it incorporates by reference or that a skilled artisan would appreciate, as my friend on the other side's client argued below, that you would get that directly from Chitwood. It more completely overlaps with the claims. I mean, you are all right that even though Dr. Valdez did not think that the carbon was covered by the claims, he thought that it was lower than their carbon, and that was a point that they were consistent of in the emails in 2013. It would be enough not to be cumulative if there was even one element or one basis for disputing obviousness or novelty that was not in Chitwood but is in CIMAX. I think that as a general proposition, that's right, but the issue of the overlapping chemistry . . . places almost no emphasis on the carbon element, much greater emphasis on other aspects of CIMAX. Correct, and two points about that. Number one, there's at least a disputed fact issue as to whether or not those other aspects of CIMAX are disclosed in the Chitwood reference, which was the public published version, as Dr. Valdez called it, in Appendix 7793 of the CIMAX process. And number two, you have the rest of the CIMAX. The only thing that was not disclosed in the prosecution of the 074 and the 075 was the chemistry specification, the difference in the carbon, which . . . The chemistry specification, there are a bunch of . . . It's four pages out of . . . No, I know, but there are many chemicals that are listed in that chart, not just . . . There are, and with respect to CIMAX, the carbon one abuts at the low end. Silicon abuts at the high end, and that . . . I don't recall that the others overlap, but regardless, it doesn't disclose aluminum, for example. I think some of the others do overlap. My recollection is most do, not everyone. I think that's right, Judge Toronto. My modest point on this is that if you look at the 4100 series, or frankly, if you look at Valdez 2010 . . . What do you make of the other . . . They all overlap. What do you make of the point, I think was asserted, that the CIMAX says something like, we have a special 4100, not one of the ones that is listed in whatever the standard association . . . Yeah, I think all that does is go to identifying the specific chemistry. That's, in other words, that's showing you the specific chemistry. The 4100 series shows you a broader range of chemistries, a frankly more relevant range of chemistries . . . because if you take carbon, for example, it more completely overlaps with the range. And so, if the idea is, just like Valdez 2010 disclosed a carbon, disclosed a silicon that was in the heartland of the range . . . to the extent that it wasn't disclosed. The only thing that wasn't disclosed in the prosecution of the 074 and the 075 is the chemistry. And, I would say that that is entirely cumulative with the chemistries that are disclosed, both by Valdez 2010 . . . but also Chitwood. And, the reason it matters in terms of the 074, 075 disclosure, that goes above for materiality. Everything else in CIMAX was disclosed for the 074, 075. And, the 074, 075 issued, notwithstanding that that was the case. And, in fact, not only were they disclosed, but specifically brought to the prosecutor's attention. In Appendix 66, 64 and 66, 65, you can see where not only the CIMAX documents . . . other than chemistry specification, which wasn't disclosed at that point. But, other . . . but Chitwood itself was brought specifically to the prosecutor's attention. And, then you have the grandchildren patents. One more materiality question. It seems like in the red brief, the theory of materiality of the CIMAX brochure . . . was completely different than what the District Court found and held against you. Am I wrong about that? You are correct. And, what do I make of that, if that's the case? I think what you make of that is that there's . . . that certainly the District Court's basis for granting summary judgment should not be affirmed. I mean, for starters, the District Court didn't apply the Buff Four materiality standard. We could reach and affirm on the grounds that's argued in the red brief. You theoretically could. We're here on summary judgment. The Court reviews de novo. These issues are fairly before the Court. They were fairly before the District Court. But, my simple point is everything that they then argue, they're sort of at war with themselves. On the one hand, they want to make a big deal about the fact that it wasn't entirely disclosed. On the other hand, the only thing that was not disclosed was the chemistry specification. And, they don't talk about the chemistry specification because it doesn't matter. And, the reason it doesn't matter is because that was otherwise disclosed. Now, I realize I've completely blown through the time that I was . . . I assume you plan to do your Section 2 argument in your second panel. I do. So, I'm happy to answer additional questions. We've spent all our time talking about materiality. But, I think what the District Court found troubling, what I found troubling, is this statement. And, you know what I'm talking about. I do. The bubble statement. Can you help me before we get to the last sentence of that bubble statement with the preceding sentences and how you think . . . Because, I understand the theory is, well, this is just commenting on why this doesn't provide secondary considerations evidence. Right. So, I have a hard time following all the technical aspects of those prior three sentences. I mean, I get the gist of it. My problem is that what he's explaining in those prior three sentences doesn't match up with that last sentence in my mind. And so, I'm trying to figure out why that last sentence, which says, I don't think it's a good idea to disclose this, is not evidence of intent. Yeah. So, Judge Hughes, just to take a step back. And, I do think the words here matter. In particular, because you're dealing with somebody whose English is not their first language. He specifically, he says, I'm not sure it's a good idea to disclose this document. And, let me give the wind up to that. Because, he says in his deposition, in Appendix 7799, that his point was, he was asking the attorney about whether this would be helpful or not. That he wasn't sure whether it was. And, the context for it, if we take two steps back, if you first look at the basis for the rejection, the basis for the rejection was that you did have something that actually disclosed this chemistry spot on, Valdez 2010. And then, there was the question of, you know, do you have secondary considerations? The prosecuting attorney then specifically instructs, and this is in Appendix 7710, that we need to, quote, make sure the evidence in our declaration is tied directly into our claims. That's the words from the prosecuting attorney. Tied directly into our claims. End quote. So, in response, and knowing that he wants evidence of failure or secondary considerations, he voluntarily discloses. I mean, if he was intending to deceive, he didn't have to even acknowledge the existence of the Simex document. Dr. Valdez. Voluntarily disclosed to his own lawyer. To his attorney. Not to the PTO. Not to the PTO. That's right. But, to his attorney. I mean, if he wanted to act like it doesn't exist, he didn't even have to acknowledge that it exists, much less send it to his attorney. I'm not sure that matters much to me. I mean, whether he's lying to his attorney or lying to the PTO, I mean, that's a hypothetical. I understand. It doesn't make any difference to me. Maybe he's telling his attorney, we've got this thing, but I don't think we should send it out. Yeah, and I don't think that that's a fair reading, Judge Hughes, because what he's then saying, he then is telling the attorney for the first time about the failed attempt called Simex. And when he says that it is outside of our carbon range, now, I understand that that was wrong, but he believed it. If you look at the email in 2013 where he was told about this in the first place, it says essentially the same thing. That this is not our chemistry is not about, or this is our chemistry in 2013, is not about the claimed steel. It's about their prior art steel. It's about their conventional steel. Sorry, I don't mean to interrupt you. No, no. I appreciate the question. The problem with your explanation for why this wasn't relevant seems to not cut against what he's talking about here. That doesn't seem to talk about secondary considerations necessarily. He's talking about how these aren't our claims. Right. And so I understand because he's popped this up as a bubble to the secondary considerations that you want us to draw that inference. But the comment doesn't seem related to that at all. And, I mean, we all know how we edit documents sometimes and make comments. Sometimes we think of a comment and there's no place to actually put it in. And you pop it in here. Now, maybe that's why this is not a summary judgment question. But I find the phrase, I'm not sure it is a good idea to disclose this. It's pretty tenuous to me to say what you're saying he meant, which is this is not relevant. No, I do appreciate the question, Judge Hughes. Particularly because none of this comment bubble to me seems to be talking about secondary considerations. Well, again, I think it's a rise in the content. And he spells this out. If you look at Appendix 7799, that's his deposition. And, of course, deposition is just cross-examination. It's not direct. But what he says, I've been asked about people struggling. And he says, quote, but I thought maybe it's not a good idea because it will not be aligned, this is his word, not be aligned with the claimed coral tubing, so it will be confusing. It was a different product than the one we were claiming. So I thought it's not a good idea, but I thought I'm not sure. I also left it for his opinion. That's why I included it, referring to the attachment, for him to have a look at the document. That's all from Appendix 7799. And so this is arising in the context in which it's been rejected over the claimed chemistry. He's been asked for evidence of secondary considerations, quote, tied directly to the claim. And he then says, I have this as an example of a failure, but it isn't our chemistry. It isn't our carbon. And, by the way, that is what the prosecuting attorney took from that. If you look at Appendix 7788, the prosecuting attorney then wrote in the same comment bubble, quote, project did not work outside of our carbon, end quote. Now, look, at that point, should the prosecuting attorney have, like, actually looked at the document, there's nothing in the record that suggests that they did or didn't one way or the other, and then had, you know, had a discussion about whether or not it was confidential, whether or not it should be disclosed? Of course, if he thinks this isn't his chemistry, so it isn't prior art, why wouldn't he have disclosed it? So, Judge Hughes, I mean, look, I, you know, the other side. I mean, honestly, that counsels for patentability, doesn't it? It's, look, somebody was operating in the same field. They tried something very similar. It didn't work. We've made a change, and so see how ours is an innovation. No, I understand that as a patent attorney, when you look at this, you say, this seems like this would be helpful to you, because it seems like it actually is evidence of secondary considerations. But when you're dealing with someone who is an Argentinian metallurgist and who's been asked for evidence of failure that is tied directly to the claims, and he gives the attorney the document that says it doesn't match, it's not our carbon, I'm not sure it's a good idea to disclose this document, I think it's a fact. I don't remember seeing reliance on your part on the fact that Dr. Valdez doesn't have English as a first language. I think we identified it. I'm not, but I think it goes to, you know, how the district court, I mean, I know we identified it in the briefing. Is there evidence for that? I don't think there's any dispute that English is not his first language. I'm not saying that he isn't speaking English well. If you look at the public comment, even just on this page, it doesn't suggest to me that he doesn't have a grasp of English. I mean, oh, and I don't mean to suggest that he does, but I do think that when you have someone who isn't speaking English as their first language, they're going to use words in a way that might be different, and they're not going to convey subtleties that you and I might convey. And at a bare minimum, if you have a trial, the district court can, you know, assess Dr. Valdez's credibility. Is there something in his deposition or something to indicate that English is not his first language, or are we just supposed to take your representation on that? Judge Stark, I don't know off the top of my head whether there's something specific about that in it or not, and I'm only providing context. If you, you know, are essentially asking the question, what difference would it make to have a trial? Can we set aside that he's not a native speaker? Sure. I don't know that that was really arguable or was the basis. If we assume that he has a native English speaker, what's your response then? That, I mean, I just, I'm asking one more time. I find it completely implausible to read, it's not a good idea to disclose this as anything other than telling the prosecuting attorney, don't disclose this document. If that's the case, that's intent, isn't it? I know you disagree. I'm not asking you to continue your case. But if the only way to read this is, you know, I don't think it's a good idea to disclose this document, means this is potentially problematic for us, don't disclose it. That would show intent. Well, it would then turn on whether or not he believed that it was a public document, whether or not he believed that it was otherwise relevant to the prosecution. And so, I mean, I, you know, certainly if you read it that way, it means he intended for it not to be disclosed. The question then would be, you know, does that have the necessary intent to deceive, you know, given those other issues as well. And the only other point that I would make on this is if you kind of look at the back and forth, I mean, you know, there's nothing from his attorney that suggests that his takeaway was, oh, I should not disclose this document. I mean, again, the comment bubble from the attorney back is, you know, did not work. His attorney is your attorney? I'm sorry. Dr. Valdez is the attorney who was doing the prosecuting at that point in time in 2017. The prosecuting attorney who, you know, represents Tenaris at that point in time. He says his comment back is not, oh, not to disclose. It is, you know, did not work outside of our carbon. And then asked, was specifically asked about this document two years later by the later prosecuting attorney. So there's a different set of prosecuting attorneys in 2019 was specifically asked about it. You can see it Appendix 8003. And the former prosecuting attorney did not even recall the brochure, that they don't remember any kind of discussion involving the CIMAX documents. Now, you can say, well, maybe that's convenient. But this is, you know, one attorney for Tenaris who had done the prosecution in 2017 telling another attorney for Tenaris who's doing the prosecution in 2019. But if we're looking at subsequent actions and other attorneys later on said, we better turn this over or you're going to be committing inequitable conduct. And they did, you know, with the exception of the chemistry specifications. See, this is the problem. They did. I don't know when you want. Well, that's a problem for me. But I don't know whether you want us to confine it to just looking at this bubble to look at intent or if we can look at the pattern of conduct in relation to the CIMAX document. And this bubble is troubling enough to me. But if you look at the pattern of conduct and the way they resisted turning it over and ultimately did but not as one document, I mean, it's really troubling. So, Judge Hughes, for purposes of how the case comes to you on summary judgment, which was entirely based on Dr. Valdez purportedly having committed inequitable conduct as a matter of law, the subsequent actions in terms of how the CIMAX document was later disclosed, Dr. Valdez is not alleged to have been involved with that. And the district court certainly didn't suggest that he was. And so I don't think that you can attribute that for purposes of deciding inequitable conduct. I don't think that you can attribute that to Dr. Valdez. And, again, it was all on but for materiality, all ultimately disclosed, and the grandchildren of the patent weren't discussed. Thank you for your indulgence, Judge Taranto. You will not necessarily be restricted to 12 minutes, so let's see how things go. Thank you, and may it please the Court. In my not-necessarily 12 minutes, I'd like to start with inequitable conduct and then turn to the antitrust cross-appeal and the exclusionary power of the patent. With respect to intent, under settled law, intent to deceive can, in rare circumstances, be subject to summary judgment. Intent has to be reasonably disputed. If the excuses are completely insupportable, contradicted, conflicting, specious, this is language from paragraph podiatry, then a district court can grant summary judgment as a matter of law. That's the only limited circumstance. We need to find that basically no reasonable person could find any plausibility at all in what Mr. Valdez has explained in his deposition, even taking all the evidence in the light most favorable to Tanaris, right? I think that's right. I think that the Court would have to conclude that the soft factors of lie of witness examination, sort of demeanor, tone, that type of thing, couldn't change the result on the objective facts because the objective facts speak so loudly that, as the district court said, look, before the magistrate, they came up with excuses. That's at 4046. The magistrate said— There was no fact-finding in front of the magistrate, right? She was dealing with a discovery dispute. Exactly the district court's point. The magistrate rejected it as completely unsupported, said it has no support in the record, and then two years later, and this is page 8 of the appendix, the district court says, and it's now two years later, and they still don't have anything to support it. That struck me as a very odd framing of it. You take a magistrate judge's thorough discovery analysis, which expressly makes no findings of fact, says there will be a trial later probably, and then you say, as the district judge, no new evidence has come to light, so I can find on this record without looking at a witness, without even establishing, by the way, what the entire record is in front of me, that this person is definitely lying, and so I don't even have to have a trial and watch and testify. Certainly that the explanations just don't make sense, and they so don't make sense that they don't have to have live witnesses. And so maybe just start with the first, like, look, this is the declaration, the comment bubble on the declaration itself Judge Hughes pointed to. I mean, that is telling in and of itself. It's not, gee, it's cumulative. Chitwood might tell us this. You would have to acknowledge, I think, in his deposition he gives a, I'm going to put it in quotes, innocent explanation. Now maybe he's lying in his deposition, but how do we know that he's lying in his deposition without calling him in and putting him on the stand and subjecting him to cross-examination in front of the fact finder? I think there's two key things about that supposedly innocent explanation. First, it doesn't really make sense given what he was asked for against a whole trajectory of conduct, frankly. But he was being asked for evidence of failure of others to achieve the claimed invention. This would be great evidence of failure to others if he thought they just were close to it, but they were missing one piece. And second, it's also flatly conflicting because, remember, when it came to the range, Valdes testified that you could actually go, you're not at .17, you can actually go below .17 and still be within the patent because he claimed it was about. And they actually obtained, if you look at Docket 148.5, they obtained a claim construction based on that testimony that went below .17. So it's not, gee, oh, I thought it was outside the range. I thought it was outside the range, but actually I'm going to testify the range is broader. Look, I get all that. Maybe you prove inequitable conduct at trial, but we're talking about a guy who's not a patent lawyer who's asked a question on a document years earlier and writes a statement that could be entirely damning, but maybe not entirely implausibly could be viewed the other way. I don't understand how there's not a fact dispute and the fact finder at least has to give the guy a chance to explain himself and decide if he's lying or not. Well, I think especially if the district court were the one who's the fact finder, the district court could say this is simply not persuasive and this is not just some guy on the street. It's a different task to sit there as the fact finder judge when it's a clear convincing burden, but you decide what the facts are based on all the evidence in front of you versus at Rule 56. I think the law is clear. The judge has to ask himself, not me, not do I think he's lying, but could any reasonable fact finder sitting at that trial, that bench trial, taking the evidence in the light most favorable to Mr. Valdez's side possibly believe him? Those are two different things. There's no indication here that the judge went through that analysis. So it shouldn't matter for the outcome here, right? Because especially if the Section 2 case comes back, we're going to have a jury trial where there may be common issues. The jury would have to go first, the judge second. But the Fifth Circuit's actually explained its rationale, why it makes a difference in the case of Nunez, and it's just what constitutes a genuine dispute changes depending on the fact finder. And the judge can understand, you know what? It doesn't really matter, those soft factors. I just can't be persuaded on this. But this is not just an ordinary witness. He's a Carnegie Mellon Ph.D. with seven patents. It might be a different district court judge at the summary judgment stage in the trial. Yes, if that had been the case, then that might be something you would look at. But the Fifth Circuit law is when you're going to have the same judge, that's the answer. You never know you're going to have the same judge. Fair enough. But it is the Fifth Circuit law, and that's what this court is bound by. But even setting that aside as a question. Sorry, can I just reduce it to where I am in my mind? If we look at what this bubble comment says, the other relevant facts in his deposition testimony, and I'm convinced that I don't care how honest and trustworthy he seems if he testifies. I find this so implausible, his explanation, then there's no need for a trial on this, right? Yes, that is Paragon case from this court, and that is the Chauvin case from the Seventh Circuit, which is an unusual circumstance. Is it just basically a judgment call? Because he's come in in his deposition testimony, comes forward with an answer that seems kind of reasonable on its face, maybe out of context. So do we need a prior fact to test those two allegations, or do we get a look at it and say, well, he said this, and if you looked at it on its face, maybe, and construe it as true, then it's okay, and enough for a tribal issue. But if you look at it in comparison with what's going here and find it a completely implausible explanation for this not a good idea to disclose this sentence, then where's the line between that? The line is you look at the record as a whole, because you're presuming that everything is going to come in. And if as the record as a whole, the prior fact cannot credit these implausible, wholly implausible excuses, conflicting excuses, and there's a line of excuses here. You know, first it's non-erotic in chemistry. Then it's we didn't know it was public. That's what he tells the lawyer. And then it's, oh, it's Chitwood is cumulative with it. If you can't credit that as a whole, no reasonable prior fact would, you don't really need to have a trial. Can I ask you about what came up earlier, which is about who's going to decide this factual issue if it goes back to the antitrust case? Is it true that this is going to get submitted to, this intent question is going to go to a jury? So I'm not sure that the intent issue itself, precisely that would go to the jury. But there's sufficient overlapping facts that you would try this to the jury first. And when the jury makes determinations and you can tell the jury made a determination, that determination would bind the judge. And that's just the standard Seventh Amendment protection that you don't have your equitable proceeding first and then have the judge somehow bind the jury. If I could turn for a minute then to perhaps Chitwood, because I think the notion that Chitwood somehow, this is cumulative in the life of Chitwood, it's simply not plausible. And it's clearly material in that sense. And if the court were to turn to page 14 of their brief. Can I just ask one stray thought along the lines of, would it matter to the application of the Fifth Circuit line of cases about sometimes the judge, if there's going to be a bench trial, getting a little bit more wiggle room on summary judgment, does it matter that in that case there is a overlapping jury issue, which means that the jury is actually going to be making key decisions? And the answer is yes. The district court was able to do it in this case because the Section 2 claim had come out by the time it came to inequitable conduct. But if the Section 2 claim comes back in, we don't get that extra wiggle room. We're down to no reasonable trier of fact. But that isn't any different than Chauvin or Paragon. It's just the standard no reasonable fact on the whole thing, on the whole record. I'm looking the guy in the eye, and no matter how persuasive and genuine I think he might be, how good an actor he is, I will not be able to credit. Nobody can credit that. Were you about to turn to materiality? I was about to turn to materiality. So it would be page 15 of their brief, which is the steel specification, the 4100, and page 33 of our brief. And I think this is how you can see how clearly material it is. So to start there, just looking at, for example, start with phosphate, P. So phosphate for the chemistry, 0.25. I'm sorry, just direct me again to the pages you want. 15 of their brief. Of blue? Yes. And mind you, 33 of red. 33 of the red brief. Correct. You want us to compare. Yes. We're going to walk right through it if that's okay. And that is that, mind you, this steel specification isn't actually in Chitwood. It's behind a paywall. You're going to have to go look for it, and that's why it's not disclosed. But even if we assume that the examiner goes to the paywall and gets this. Look at the phosphate, 0.025 max. And look at phosphorus, rather than phosphate, for the 2.56, much lower, 0.015. And CIMAX tells you, 0.025, that you're going to need that lower phosphate. Sulfur, much lower, 0.005. And this for ours, it's 0.01 and 0.005. This whole theory, this is not the theory that the district court went off on to find platform materiality. The district court was more focused on carbon because of the overlapping carbon range. But even for carbon. This is not the theory that you won on, right? Yes. So even for, I'm sorry. Actually, you know what? I have done it on page 14. That's my mistake. But yes, he was more focused on carbon. But even carbon's relevant. Because remember, the patent, 2.56, includes 0.17. So they recognize you can go lower. Like you told the district court that you wanted summary judgment just on your affirmative egregious misconduct theory. And that you didn't even have to worry about but-for materiality or intent. And yet, his opinion is all about but-for materiality intent. And he doesn't even reach affirmative egregious misconduct. Am I wrong about that? No, Your Honor. I think we actually sought judgment across the board that you had intent. And especially... But at the hearing, did you tell him you only need to address our affirmative misconduct theory? That would, yes. We did tell him that that would be a shortcut through it. But the district court, in his judgment, said that he doesn't have to reach but-for materiality because the intent was so clear that there's no reason to try to find otherwise. And the materiality was so clear. It seems like these theories that there's contradictions between what the applicant told the patent office and what the CIMAX document shows and therefore it's material, that seems like a should-have-known standard. A materiality standard more like the PTO standard less than what Theracent says is required to show but-for materiality under inequitable conduct. And I think that argument was well set out in the blueprints. I didn't see any response to it. Could you tell me? So if I understand correctly, the district court clearly did apply a but-for materiality as standard because the district court said on page 15 it's not going to address the extreme misconduct standard because defining a but-for materiality makes that irrelevant. And the district court walks through and explains that, look, it's just not the same to have, say, Chitwood is the same as what was here. And the district court also is very clear. We're talking about an affidavit that's trying to overcome a rejection. How do you overcome the rejection? Six times the affidavit says, our specific chemistry, our critical chemistry, our important chemistry. It's chemistry, chemistry, chemistry. And what gets withheld? The documents that show that this chemistry was already there in a single product that was already on the market, CYMAX. It's hard not to think that's material. And it's especially clear when you look at the chemistries on page 14. Can I just ask, were any other elements of chemistry, of just chemistry, missing from Chitwood? So any other elements other than chemistry? No, any other elements besides carbon of the chemistry. Oh, no, absolutely. So Chitwood just says Series 4100 Steel. It doesn't actually give you the chemistry. So you have to go from Chitwood, behind a paywall, get the 4100 chemistry on page 14. And then would you get all of the chemistry in overlapping with the 256 claim, or not all of it? No, you're going to get overlapping, but different ranges where the 4100 isn't going to produce the necessary hardenability, but the specific chemistry, the 90% martensite, but the specific chemistry of the modified 4100 that's disclosed in CYMAX will. And that's actually one of the things that their own head of R&D said is, hey, there's a document in here, I think that's 7222, where it's asked by the lawyer, CYMAX versus Chitwood. And he says, you know what? 4100 isn't going to get you to 90% martensite, but the more specific chemistry in CYMAX is going to get you to 90% martensite, which is an element of the claim. So that is disclosed by the chemistry in CYMAX. That's page 7222 or 7227, it's one of the two. But it's not disclosed by Chitwood. And Chitwood's very important because if you take a look, the 4100 chemistry, it's the standard phosphorous, 0.035. But what does this require? 0.015. You have to have much less phosphorus. CYMAX also warns you, you need lower phosphorus. Sulfur, same thing. I may not have asked the question correctly, but I don't understand the answer. So let me try again. It seems like a lot of what you're arguing on materiality is that a mere contradiction between what is said to the PTO and what the internal CYMAX documents showed makes the internal CYMAX documents material in an equitable conduct sense. Is that part of your argument? No. Just a mere contradiction by itself wouldn't show but-for causation. You have to look at a lot more. But remember, we're at a point where they've been... What more, like for phosphorus, for instance, what more do you think you've shown than just a mere contradiction? So I think there's three things. First, remember the context is you're seeking to overcome a rejection. So it already stands rejected. And so you're going to have to be able to say something to move the examiner off the rejection. And if you use the specific chemistry to move them off the rejection and then don't disclose something with the specific chemistry, that's going to be very much likely but-for causation. Second, remember this is an element that's 90% Martensite. But he's saying we're not going to achieve the invention with just the 4100 of Chitwood. Their own documents say you can achieve it with the CYMAX, which is more specific. So there's a limitation missing, an unachieved limitation, if you look only at the 4100 compared to whether you look at the CYMAX document. And also, it's a big difference between trying to piece together different pieces from different places. Well, this from 4100, that from there, versus the CYMAX document where it overlaps, overlaps, overlaps, and is much more constrained and precise in matching to the requirements, particularly with respect to sulfur, particularly with respect to phosphor, and even carbon, that you can have a lower carbon version down at 0.17 where the standard is 0.18. That's CYMAX. If I could ask you one more materiality question. It goes to the Commissioner Stoll expert report. If I understand the record correctly, the magistrate judge excluded that testimony, but they objected to that order, and the district court never resolved that objection. So I don't know whether the Stoll testimony is in the record for purposes of summary judgment or not in the record. And if it's in the record, then I think it has to be taken in the light most favorable to Tenaris on the materiality issue. What do I do with that? So if, Judge Stark, you're referring to the Stoll testimony with respect to the grandchildren patents? Because that was the piece that was at issue. It goes to materiality. Yeah, if that goes to materiality, and that is not resolved. But I don't think that can make a difference because the grandchildren patents were rejected and only survived. They only became accepted when they added additional limitations like an austenization cycle, like particular temperatures. And so it really just doesn't go anywhere. My take from that is the district judge should have assumed, and I should assume, that the Stoll testimony is in the record, takes it in the light most favorable to the non-moving party. It just doesn't make a difference. I think that's a precise summary of what I'm saying. Yeah, thank you. If I could turn quickly to the class appeal in whatever time doesn't remain to me. The district court there committed two basic mistakes. The first is in evaluating dangerous probability of success, it failed to examine the patent's exclusionary power, and it looked to market share alone. And when you have a barrier to entry like a patent, you've got to look at its exclusionary power. And there's Supreme Court cases, spectrum sports alike that say exactly that. And second, in looking at market share, it violated controlling Fifth Circuit precedent by failing to examine market share at the time of the attempt, which starts here in 2017. And in 2017, the market was dominated by Tenaris, not us. It just simply makes no sense to look in an attempted monopolization case to look two years later or five years later at the time of summary judgment and say, yes, since you didn't succeed, you now have a small market share. Get out of jail free. The whole point of an attempted monopolization case is that things change on the ground, and the monopolization might fail, especially if you have somebody who stands up for their rights and files a lawsuit and uncovers the inequitable conduct. But that failure doesn't mean you get out of jail free for the attempted monopolization. Tenaris cites cases that Section 2 is directed at persistent market power and that there needs to be some at least minimal durability. And I think they suggest two years would not be enough. What's your response? Well, I think there's two responses. First, two years is amply enough to raise an issue of fact for the jury. And there's two cases that say that. One is Pharmatec, and that's the second case from 2004, which is a 15-month period in quality markets. Also, second circuit case, which is a two-year dominant position. So two years is amply enough. And letting someone be the dominant player for two years, able to charge super competitive prices by having excluded the one potential entrant they know about, us, global, that's too much for the antitrust laws. But even apart from the two years— Is the temporal period for this purpose the same as or different from the temporal piece of SNP? So I think when you're talking about durability— I think the durability is basically the SNP. The durability is the non-transitory. Can you raise your price without prompting immediate entry and make a sufficient profit on it that it makes sense to the antitrust laws to hold people liable? Is there a case law on that, whether two years is too transitory? So the two cases I gave you— I'd say that two years is not too transitory. Well, for market power or for monopoly power? For—I don't know if they distinguish market versus monopoly power, but certainly enough market power to raise prices for a non-transitory period, that would be enough. And certainly on summary judgment. If they want to show, come to the economist and say, there's no way we could have raised prices, let's see that, but I think that's going to probably go to a jury. But setting that aside— In this kind of analysis, who has a burden on the question of entry barriers? So initially, we would have the burden on entry barriers, but I think we amply meet that burden, and I'm going to point to four particular things that address that. The first is out of their own mouths. The interrogatory response on 11,302, and we asked, what are the non-competing, the non-infringing alternatives to your quench and toil tubing? And the answer was conventional tubing. And this was years after quality entry. Is that the one where first they didn't give a response and then later they did a response, and it's the second time they actually just referred to a number of different conventional tubing things? Well, no, they actually used the word conventional tubing. They said such and such, yeah. But they don't mention, and they specifically don't mention qualities in the market at the time they answer. They don't say qualities of quench and timber tubing. But second, they also go and analyze quality-specific chemical specification to see how it fits in their patent, and it says 11,482. They don't give the results to us, but if you took Church Page Appendix 9946, the very last line, and this is under seal, so I'm going to be very careful, but this is Council— 9946? 9946. But the Council is very clear that the 256 patent covers global quality products, so that's covering quality too. Third, quality specifications are in the record. If you look at page 11496, and you want to line those up right next to the specifications for the patent, you're going to see a sufficient alignment to know that the assertion of the patent has a dangerous probability of excluding anybody with those specs, and that's particularly true given the position they took, which was it doesn't have to be precisely within the ranges. Approximate is good enough, and they got a ruling from the district court that approximate is good enough for infringement. Can we put any weight on their representation to the court that they have no intention of doing? I think, actually, it points exactly the other way, because it was such a wonderfully careful representation that they have no present intent to sue quality, but they won't say we didn't have that intent. I'm running for president. I have no plans. I have no current plan, or I have no current plans, but I might have had plans in the past, and I haven't denied it. If the court has no further questions, I'll reserve whatever remains for rebuttal. Thank you. Oh, no, you had eight. Around ten. Thank you, Judge Toronto. I'll start wherever the court would like me to, but perhaps it makes sense to start with the antitrust issues here for a number of reasons. First of all, on my colleague's last point, it was not a careful no present intention statement below. I'll say it unequivocally. The patents that we're talking about here are not going to be asserted against quality, period, full stop, for the products that were at issue at the time that we're talking about, period. There's no hedge there with respect to the quality products. That's not equivocal. For the products at the time we're talking about. Well, I don't know about some future product they might make, Judge Hughes. I'm not giving that away, but I don't know what I don't know. But for the product, for example, the specification that he pointed to, you know, if you take that quality product and that quality... I don't want you to spend too much time on this because I think it's not very useful to me. I mean, I think the theory they have that the reason you didn't go after them was because somebody had already or was about to discover the inequitable conduct and inability of the patent, so you don't want to add to the possibility of being exposed to Walker process antitrust ability, but we don't need to get into that. No, I mean, with respect to the District Court's grant of summary judgment, it really turns on two things. One is that even if they succeeded, this isn't a hindsight issue. This is their own experts looking backward and then looking forward. If you succeeded, what would you achieve? You would achieve 29% of the market. As a matter of law, that is not enough. And then in order to try to rehabilitate that, their theory... I'm sorry, and the 29% just comes from basically taking them out of the market and distributing their share proportionately to the other two players. That's...it's the analysis that their expert did. I think that's more or less what their... I didn't know that, but it works out to basically be that. It's the analysis their expert did that said if you succeed in eliminating Global, and Global is all they ever allege that any, you know, antitrust... any antitrust scheme included, their complaint doesn't ever, even though quality was already on the market at the time of their Second Amendment complaint, they make no allegations about quality. And of course, you know, the complaint is limiting. You look at the Supreme Court's decision in De Beers v. United States, 325 U.S. at 220. It's a Sherman Act case. But in all events, in order to try to get around that, they then argue to the district court, well, never mind our expert. We'll disclaim our expert. They also have a dangerous probability of excluding quality. And the problem for them is they have no evidence, none. If you look at their gray brief, pages 7 and 8, those are the two places that they cite all of the evidence that they've got with respect to the issue over whether the patent itself could be asserted against quality. They have no document, not one, that says that Tanaris thinks that quality infringes. They took no discovery from quality. ...record in the light most favorable to them. You have a patent. There's nothing to say that you're not going to assert it on this record against the entire industry, including quality, and therefore there's a dangerous probability, regardless of what your market share is today, there's a dangerous probability a reasonable fact finder might find that you could attain at least market power. Well, the district court asked them questions about this in two places. First, with respect to the scope of the patent, at Appendix 31,141, their response was, and this is at 31,150, that they haven't looked at the issue closely on whether it would be more difficult to design around the patents. And then if you look at Appendix 11,480, that is the quality specification you will see. It does not read on the silicon requirement, and most importantly, 11,480, that is the quality specification that is in the record. It does not read on the claimed silicon content, number one. And number two, it also does not read on the critical issue of yield strength. Every one of the patents requires a yield strength of more than 80,000 PSI. And you will see if you look at their own specification, both in terms of the minimum and the aim, it doesn't get there, number one. Number two, the district court asked, what was the evidence that there was a plan to assert against equality? And he repeatedly asked about this at Appendix 31,134, 31,184. He said, how can we just assume that that's what it comes down to, an assumption that they're going to sue? And the evidence that they were, quote, flexing their monopolistic market was conjecture, end quote, at 31,188. And you can see what their responses were. It is what they cite to at page eight of the great brief, and we respectfully submit that that is not enough. It's exactly what the district court said it was, which was, quote, piling speculation on top of speculation, as he said at 31,000. How does that deal with the two-year period from 2017 to 19? So two points on that. First of all, he did also ask them about what did they have to show that there was evidence that there would be persistent market power. You can see at 31,127, and they didn't cite any evidence, other than just to say that, you know. Do you think two years is persistent enough or not? So certainly, Judge Toronto, there are examples where it's not. And the examples that they've cited, too, where it is. So it's a matter of law? There are cases that have found it's insufficient as a matter of law. I think we cite those in our brief. The case that they cite, the Geneva v. Barr case, is where there was no dispute that the API that was necessary to make the generic drug, there was an exclusive agreement. Nobody else could make the drug, and the market had been defined as being that generic drug. And so in that circumstance, the court said that there was at least a fact issue as to whether or not there would have been persistent market power, or at least that the market power during those 15 months wouldn't be tempered by the fact that nobody could have possibly entered the market. There was no dispute that somebody possibly could have entered the market here. They, in fact, did. Fact issue here, though, means you lose. We have to say that. If you think that they have actually presented any evidence whatsoever to show that the fact that quality could enter the market had no effect or did not have an effect on pricing, and therefore that we would have had persistent market power, when there is no evidence on this because they didn't seek any evidence from quality, they didn't have their experts opine on this, this wasn't the theory in their complaint. They flat-out disclaimed it in opposing a motion to dismiss. I think flat-out waived it. If you look at Appendix 12410, they said, quote, the Walker process fraud claim is not based on Tenaris' assertion of the 256 patent. It is based on the events that followed. It is the assertion of the children patents, not the 256, that gives rise to Global's monopolization claims, end quote. And that matters because quality was on the market by the time that that occurred. Again, that's Appendix 12410, and it's citing specific parts of the complaint. They waived the assertion of the 256, which means they waived the time period from 2017 to 2019 that they're now trying to rely on. Can I just ask, the two children patents don't have the full chemical breakdown that's in the 256, right? So the 074 and 075 independent claims do not have the same chemical composition requirements. There are deepening claims. So in thinking about the prospect of keeping the power of your patents collectively now to keep quality out of the market, it's not a sufficient answer to say that at least one element, chemical element of the 256 might be something quality doesn't practice. No, I agree with that, Judge Toronto. Two points that are critical in response. One is the issue of the time period. From 2017 to 2019, the 256, which had the chemical requirement, was the only patent. These other patents only emerged in 2019 after quality had entered the market, number one. At least one of them, right, was published in 2017? I believe... The publication date. The 074 and 075 I think had been published in 2017, but they didn't issue... Don't you think that might have a deterrent effect on somebody deciding whether to enter? Well, that goes to my second point, which is even to the extent that it would, the claims specifically require 80,000 PSI or greater. And if you look at the quality specification, that doesn't read on that. And that is in the independent claims, separate and apart from the chemistry, is the PSI requirement. And so the district court held them to whether they had evidence to show that there was a dangerous probability of monopolizing, and the short version is that there was not, and the district court is right about that. And then with respect, very briefly on rebuttal, my colleague said that the Chitwood reference doesn't disclose hardenability or the Martensite feature. That's inconsistent with their own invalidity contentions. You can see at Appendix 6801. And what you have is, as I, you know, I'll end as I began, which is there are fact questions as to intent. And Judge Hughes, I understand that the comment bubble, you know, is, I understand your questions about the comment bubble. I will just note this Court has never affirmed a grant of summary judgment of inequitable conduct on anything other than an outright falsehood with a representation about somebody being impartial when they were, in fact, a partial declarant. And so I think there are fact questions here vis-à-vis intent, some of which, you know, Judge Stark, you were getting at. There are certainly fact issues as to cumulativeness involving, you know, Commissioner Stoll's testimony, involving the grandchildren patent about, you know, I think this is just like digital control, in that there are fact questions about how you compare what is disclosed from Chitwood versus what you disclose for invalidity. And there's certainly, with the grandchildren patent, you know, evidence that goes to Buffmore materiality that at most presents fact questions. I thank the Court for its time. Thank you, Judge Taranto. Do you think you can do it in three? I'll do my best. And if the Court asks me to stop, I will stop. So I think we can all agree that Tenderis' assertion today that it's not going to sue Quality is not meaningful. The question is what was the state of the world in 2017 when there were only two competitors, and that one of the competitors was us, a potential entrant, and the plan was to exclude us, and they had this ill-gotten patent to that end. In terms of, and we do have evidence, frankly, in an event that Quality, they understood that Quality's product infringed also because Appendix 9946 makes that clear. But we don't have to prove that they actually would be liable for infringement because if you look at TransWeb, TransWeb tells you that the threat is good enough because in TransWeb there was inequitable conduct and a Walker process claim and damages for Walker process, but the jury found that there was no infringement. And that makes sense because it is the threat to exclude that gives you market power, not a final perfect infringement verdict that gives you that market power through the patent. Why shouldn't you have had the obligation to get the information about Quality's product and show that at least a threat of infringement was a plausible one? That is, as opposed to, I don't know, 80 pounds per square inch or something that was mentioned, maybe they are so far away from that that there just could not possibly be, it would not be a genuine threat. Right, and I think the answer is we actually did invoke that specification below and say, this is close enough that Quality would be threatened. And one of the things that's particularly important with respect to that is the claim construction that Valdez testified for and they got at Docket 140 at 5, which is these numbers don't mean the numbers. It's an about. And so if the statement is silicon seems to be out of range, if it's about, and I think the language they used when they got the about was that if it's close and has the same effect, that's good enough, then that's going to be a threat. And I think if they're going to say, no, we couldn't have excluded Quality, it was impossible, there's actually lots of ways around our patent, that's a response to them. For summary judgment, the fact that they tried to exclude their only competitor in 2017, they were going to go after and they evaluated and they had language about Quality later on, that's all good enough. And if the court doesn't really want to get into all that, all the court would have to do is say, the district court made two mistakes. Wrong time frame, wrong market power analysis. But the district court assumed that the market was what you wanted it to be, so I don't think that helps you. I'm not sure it does because it's small by any means. If you looked at the full global market or looked at all coiled tubing, the numbers are still small. I just don't know what it is. Sorry, I asked you the wrong question. I'm sorry. Could you respond? They say that these theories, which have some appeal to me, are not the theory that was in your complaint and I really shouldn't be worrying about them because you've kind of waived these theories. Yeah, and so I think that's just doubly wrong. The first is, is it in the complaint? If the court looks at Appendix 2058 to 4059, it alleges the Walker process fraud based on Tanaris' prosecution and enforcement of, quote, the asserted patents. When that second amended complaint came out, that patent had been asserted against us. And if you look at Paragraph 4, 2015, it talks about the 256 patent, which is asserted in this case. I don't think it's mistakable, the 256. That's a statement that was read to us, I guess, from a hearing where counsel said, that's not our theory. No, so it's not from a hearing. It's one of three points made in opposition to a motion to dismiss. And the first two points were they have market power in the relevant time because of market share. The second point was exclusionary power. And that second point in the document specifically relies on the exclusionary power of the 256. So that's the third alternative argument. But that would only matter, the fact that the language seems to say, oh, that's not really our theory, would only matter for judicial estoppel if the district court relied on it. Well, if the district court had relied on it, he would have dismissed part of our complaint. If the district court had relied on it, he would have said, you know what, I relied on that. You tricked me. I'm going to judicially stop you from making a claim now. But none of that happened. The district court simply went on and looked at the merits. And we, you know, four months before this, frankly, we answered interrogatory and told them flat out, 256 is the core. You've got the 256. You're coming after the 256. And they never objected to that. If there's no further questions, I see Judge Toronto looking around. Thank the court for its time. And we ask the court to affirm in part and reverse. Thanks. Thanks to all counseling cases submitted.